## FOOSHEE & HUNGERFORD v. CITY OF VICTORIA.

### No. 8875.

Court of Civil Appeals of Texas. San Antonio.

Oct. 19, 1932.

Rehearing Denied Nov. 23, 1932.

Linebaugh & Guittard, of Victoria, and H. W. Wallace, of Cuero, for appellants.

J. L. Dupree, Proctor, Vandenberge, Crain & Vandenberge, and J. W. Ragsdale, all of Victoria, for appellee.

FLY, C. J.

This is a suit for $25,000, instituted by appellants against appellee. A general demurrer to the petition was sustained. The facts alleged in the petition must be assumed to be true for the purposes of this appeal.

It was alleged that a regular election was held as to whether the city of Victoria should issue bonds in the sum of $250,000, the proceeds from the sale of which were to be used for the construction and improvement of the roads, bridges, and streets of said city. The proposition to issue the bonds was favored by the voters of the city and authority given for issuance of the bonds. It was alleged that after the bonds had been voted the city of Victoria entered into a contract with appellants, in terms as follows; unnecessary parts being omitted herefrom:

"First Party contemplates the installation of Street Paving for the City on streets to be hereinafter designated from the proceeds of $250,000.00 bond issue authorized by vote in the City of Victoria September 2nd., 1930, with the property owners to pay a proportionate part of said streets to be hereinafter designated, and Second Party agrees to do all engineering work in connection with making and constructing all such contemplated improvements.

"A. Second Party agrees to make all necessary field surveys, prepare all plans, estimates and specifications, proposals, contract and bond for work contemplated. Field surveys to include any adjacent areas necessary for establishing drainage provisions.

"B. Plans and specifications to include detailed design of all work necessary to complete the project, including grading, grade and alignment of any drainage ditches, storm sewers, or other drainage provisions necessary to the proper drainage of said street paving.

"C. Supervision of construction to include all assistants and inspectors necessary to properly supervise the work, preparation of all estimates and the furnishing of any reports of progress or cost data desired by the City.

"D. Compensation as agreed upon shall include all expenses including transportation and testing of materials incidental to the engineering of the project. And it is further agreed that either Mr. Fooshee or Mr. Hungerford is to be present during construction.

"It is further agreed that the work herein undertaken to be done by the Second Party shall be commenced immediately, and same shall be continued with due diligence until completed, the good of all parties concerned being considered, and that First Party, on their part, shall cooperate to the end that said work to be done by and under the supervision of Second Party shall be commenced and completed with due diligence, consistent of the good of all parties concerned.

"For and in consideration of the above mentioned and described engineering services, in connection with said street paving which is to be performed by Second Party, the City, First Party, hereby agrees to pay Second Party five per cent (5%) of the total cost of the construction of paving, storm sewers or ditches, including cost of material in construction of same, it being agreed that one per cent (1%) based on the estimated cost of construction to be paid to Second Party upon the completion of survey on any one street which may be hereinafter designated, and an additional one per cent (1%) to be paid upon completion and approval of the plans and specifications for the said improvements by First Party. The remainder of five per cent (5%) heretofore mentioned to be paid in proportion to the amount of construction done monthly."

Appellants allowed a credit of $9,332.19 on a sum alleged to be due them of $24,728; after deducting the said credit, the amount of the indebtedness was $15,395.81, for which the suit was filed. The city seems to have changed mayors, and afterwards, by ordinance, canceled, abrogated, and revoked the contract made with appellants.

It was alleged that the contracts for the building of storm sewers, drainage ditches, and other improvements had already been made and said work practically completed, and that the sum of over $55,000 has been or will be paid for such improvements.

The allegations as to the storm sewers and drainage ditches are as follows:

"Plaintiffs allege that, of said sum of approximately $250,000.00 realized from the sale of said bonds, approximately $55,000.00 has been and will be expended for the con-

struction of storm sewers, drainage ditches and other improvements contemplated by said contract and bond issue other than the paving of streets in said City. Plaintiffs are informed and believe, and therefore allege, that contracts have already been made, since the execution of the contract herein sued upon, between said City and various contractors, and work has been begun, for the construction of storm sewers and drainage ditches in said City, being those mentioned in paragraph X hereof, and an additional storm sewer beginning at the intersection of Church Street and De Leon Street in said City and extending eastward along said Church Street to Depot Street, thence northward along said Depot Street to Goodwin Avenue, the length of eight blocks, all of which storm sewers and ditches will be constructed for the estimated cost of approximately $49,350.00, including cost of engineering, such estimated cost to be paid for out of the proceeds of said bond issue, without any contribution by owners of property situated adjacent thereto. The plaintiffs allege that an additional amount of approximately $5,650.00 will probably be expended out of the proceeds of said bond issue for storm sewers and improvements not above mentioned and not now contemplated, and that no other storm sewers and improvements other than street paving will be necessary. Plaintiffs allege that the sum of approximately $55,000.00 will be all of the money expended from the proceeds of said bond issue for the construction of such sewers, ditches, and improvements, other than street paving."

The paragraph referred to in the language copied contains a description of the streets upon which the improvements were being made. The allegations as to the improvements in question separate and segregate them from the allegations seeking to hold the appellee liable for work not designated and which is merely anticipatory.

■■ Appellants have based their suit for recovery for profits on the $250,000 bond issue, and contend that work on designated streets was to be done, such designations to be made at once and the whole of the amount of the bonds expended thereon. It is insisted that, when the bond issue was authorized by a vote of the people, such authorization was equivalent to a mandate to the municipal governing body to spend the money as fast as possible, no matter what inflation or depression existed, no matter what the market value of the bonds might be, the city council had been ordered to get what money they could and then spend it as fast as possible. The mandatory order to sell bonds and spend it at once on street paving carried with it an imperative order to levy assessments on owners of city lots in sums which in the end would result in an expenditure of $500,000. The suit of appellants contemplates such assessments and such expenditures, and they are seeking to recover the modest sum of 5 per cent. on that vast outlay of money. To recognize such a claim would have the effect of placing the government of the city in the hands of appellants and rob the city council of all discretion in the government of the municipality. No authority for such theories as those advanced by appellants has been presented, although it has been represented that wide search has been made for them. As said by a learned lawyer who cares more for wisdom and reason than for the rules of grammar: "It ain't in the books." The governing body of the city of Victoria has not and cannot abrogate the power and discretion vested in it by the voters. The bonds were placed in the hands of the council for certain purposes. The council had the power to determine the time and manner of the expenditure of such fund, and they cannot be interfered with in the discharge of their powers by any judicial procedure, even though a contract has been made by them which would conflict with their governmental discretion. The council alone had the power to designate streets for improvement, and they could not be compelled by judicial process to expend money for such purposes at a time or in a manner not deemed by them wise and expedient. Dillon, Mun. Corp. (5th Ed.), §§ 242 and 243. The learned judge said:

"Power to do an act is often conferred upon municipal corporations, in general terms, without being accompanied by any prescribed mode of exercising it. In such cases the common council, or governing body, necessarily have, to a greater or less extent, a discretion as to the manner in which the power shall be used. This discretion, where it is conferred or exists, cannot be judicially interfered with or questioned except where the power is exceeded or fraud is imputed and shown, or there is a manifest invasion of private rights. Thus, where the law or charter confers upon the city council, or local legislature, power to determine upon the expediency or necessity of measures relating to the local government, their judgment upon matters thus committed to them, while acting within the scope of their authority, cannot be controlled by the courts. In such case the decision of the proper corporate body is, in the absence of fraud, final and conclusive, unless they transcend their powers. Thus, for example, if a city has power to grade streets, the courts will not inquire into the necessity of the exercise of it, or the refusal to exercise it, nor whether a particular grade adopted, or a particular mode of executing the grade, is judicious. * * *

"So, also, where, by its charter, a mu-

nicipal corporation is empowered, if it deems the public welfare or convenience requires it, to open streets or make public improvements thereon, its determination, whether wise or unwise, cannot be judicially revised or corrected."

In passing upon the validity of the contract, allegations that the contract was valid, binding, and subsisting will be held by intendment to include the performance of every statutory requirement in the execution of the contract on the part of the council. This must be done under the familiar rule that every reasonable intendment will be read into the allegations of a pleading when assailed only through a general demurrer. If any cause of action is alleged, however imperfectly it may be done, a general demurrer will not lie against the pleading. To succeed in ' destroying pleadings through a general demurrer, no cause of action must be stated, or no matter of defense advanced. Imperfections, inaccuracies, inconsistencies must be reached through special exceptions. The general demurrer cannot serve the purpose of a special exception, for every reasonable intendment will be indulged to support a pleading under a general demurrer.

If it be true that there was a lack of mutuality in the contract, that defect was removed so far as that part of the contemplated improvements were completed or being completed, and the contract would become binding as to that portion of it.

It is contended by appellee that the uncertainty of the contract as to the improvements that would be made would render it void and incapable of enforcement. The contract is not open to attack on that ground. It clearly states that the streets of the city were to be paved in the designated order. The streets of the city are laid off and located. The number is known, the names are known, and all that remained to be done was the indication of the order in which the streets would be improved. The difficulties presented in the case of El Paso Gas, Electric Light & Power Company v. City of El Paso, 22 Tex. Civ. App. 309, 54 S. W. 798, cannot arise in this case, and there can be no conflict arising from fact or law. The electric lights in that case were not located and no number designated. The difference is clear.

However inadvisable and short-sighted it may have been on the part of a city administration to have made the contract with appellants, it was executed by the city, and it has no more power to arbitrarily cancel and repudiate the contract than any citizen would have. It may be that an election had been held after the contract was made, it may be that those in office were assailed for entering into the contract and were defeated on that issue, and it may be that a new administration is endeavoring to carry out pre-election promises to destroy the contract, but of these matters this court is not informed. If all the suppositions are true, they would not authorize the reckless disaffirmance and cancellation of a contract, merely because it was not entered into with reason and good business sense. There is nothing to indicate that fraud or deception was used to procure the contract or that by inefficiency or any valid reason appellants should not be permitted to do the work named in the contract.

The judgment will be reversed, and the cause remanded.